# United States Court of Appeals
## For the Eighth Circuit

_____

No. 16-3757
_____

Yaccov Cohen

*Plaintiff - Appellant*

v.

Ocean Ester Debora Cohen

*Defendant - Appellee*
_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis
_____

Submitted: April 7, 2017
Filed: June 7, 2017
_____

Before GRUENDER, MURPHY, and KELLY, Circuit Judges.
_____

GRUENDER, Circuit Judge.

Yaccov Cohen appeals the district court's[1] denial of his petition for return of a child under the Hague Convention on the Civil Aspects of International Child Abduction ("Convention"), as implemented by the International Child Abduction

_____

[1]The Honorable John A. Ross, United States District Judge for the Eastern District of Missouri.

Remedies Act ("ICARA"), 22 U.S.C. §§ 9001-9011. For the following reasons, we affirm.

## I. Background

Yaccov Cohen and Ocean Ester Debora Cohen are the parents of O.N.C., who was born on December 6, 2009 in Israel. Yaccov is a citizen of Israel, while Ocean and O.N.C. are citizens of both Israel and the United States. During the first three years of O.N.C.'s life, the Cohens lived together as a family in Israel. Between 2010 and 2011, Yaccov served approximately one year in jail on various criminal charges. Shortly after Yaccov's release, Ocean and two of her brothers, who live in St. Louis, Missouri, discussed the possibility of her family moving to St. Louis to join them. However, Yaccov was subject to a Stay of Exit Order placed on his visa that prevented him from leaving Israel until he paid his accumulated debt, which included criminal fines, penalties, and restitution payments. Yaccov and Ocean decided that Ocean and O.N.C. would move to St. Louis, and that once there Ocean would work to help Yaccov pay off his debt so he could join them. Ocean testified that they intended to move permanently to the United States, while Yaccov testified that they intended to move for a period of three to five years. To prepare for the move, Yaccov and Ocean went to the United States Embassy together to submit naturalization paperwork for O.N.C.

In December 2012, Ocean and O.N.C. traveled to St. Louis. Ocean promptly enrolled O.N.C. in school and speech therapy, found O.N.C. a pediatrician, and secured employment. Ocean purchased a vehicle, obtained a driver's license, and eventually rented an apartment. As arranged, Ocean sent money to Yaccov to help pay off his debts. In May 2013 and April 2014, Ocean and O.N.C. visited Yaccov in Israel for approximately two weeks each time. During the April 2014 visit, it became apparent that the marriage was deteriorating. Shortly before Ocean and O.N.C. were scheduled to return to St. Louis, Yaccov asked a lawyer to draft a "travel agreement"

requiring Ocean and O.N.C. to return to Israel if Yaccov remained unable to join them in St. Louis within six months.  Ocean signed the agreement after adding a clause requiring Yaccov to "stay away from crime and not get into trouble."[2]  If he breached this condition, Ocean and O.N.C. would not be obligated to return to Israel at the end of the six-month period.  In August 2014, Yaccov was arrested for driving without a valid license.

In July 2014, Ocean filed for divorce in St. Louis County.  On August 30, 2014, Yaccov learned of the divorce proceeding from a legal advertisement he received from a St. Louis law firm, and on November 13, 2014, Yaccov was served with the divorce petition.  The St. Louis County Circuit Court entered a default judgment granting the divorce in March 2015, giving Ocean sole custody of O.N.C. and Yaccov supervised visitation.

In early September 2014, Yaccov filed a request with the Israeli Ministry of Justice to open a file to return O.N.C. to Israel, and four months later he filed an application for O.N.C.'s return under the Convention.  Yaccov filed a complaint requesting O.N.C.'s return under the Convention in the Eastern District of Missouri on November 25, 2015.  After conducting discovery and an evidentiary hearing, the district court dismissed Yaccov's complaint, concluding that O.N.C.'s country of habitual residence is the United States and, accordingly, that Yaccov had failed to make a prima facie case for return under the Convention.  Yaccov appeals.

---

[2]The parties dispute the circumstances under which Ocean signed the travel agreement, but Yaccov does not seek to enforce the agreement.  Rather, he offers it only for the purpose of demonstrating parental intent.  We note that even if Yaccov had sought to enforce the agreement, parents cannot establish the child's habitual residence by contract.  *Barzilay v. Barzilay*, 600 F.3d 912, 920 (8th Cir. 2010).

## II. Discussion

ICARA implements the Convention, of which both Israel and the United States are signatories. *Barzilay*, 600 F.3d at 917. In order to state a prima facie case for the return of a child, the petitioner must establish by preponderance of the evidence "that the child has been wrongfully removed or retained within the meaning of the Convention." 22 U.S.C. § 9003(e). "The key inquiry under the Convention is whether a child has been wrongfully removed from the country of its habitual residence or wrongfully retained in a country other than that of its habitual residence." *Barzilay*, 600 F.3d at 917 (quotation omitted). Thus, the "case turns on the determination of the [child's] habitual residence, for the retention of a child in the state of its habitual residence is not wrongful under the Convention." *Id.* In resolving rights under the Convention, the court may not address the merits of an underlying child custody dispute. 22 U.S.C. § 9001(b)(4).

"Determination of habitual residence under the Hague Convention raises mixed questions of law and fact," and, therefore, we review the district court's decision *de novo*. *Barzilay*, 600 F.3d at 916. "We defer to the district court's underlying factual findings, however, unless they are clearly erroneous." *Id.*

Habitual residence is determined as of the time "immediately before the removal or retention" and depends on "past experience, not future intentions." *Silverman v. Silverman*, 338 F.3d 886, 897-98 (8th Cir. 2003) (en banc). Habitual residence encompasses "some form of settled purpose" but only requires that "the family . . . have a sufficient degree of continuity to be properly described as settled." *Id.* at 898 (quotation omitted). However, "[t]his settled purpose need not be to stay in a new location forever." *Id.* The Eighth Circuit determines settled purpose "from the child's perspective, although parental intent is also taken into account." *Id.* That said, parental intent need not be completely clear, *see Barzilay*, 600 F.3d at 918, and "one spouse harboring reluctance during a move does not eliminate the settled

-4-

purpose from the [child's] perspective," *Silverman*, 338 F.3d at 899. In addition to settled purpose and parental intent, relevant factors include "the change in geography, the passage of time, and the acclimatization of the child to the new country." *Stern v. Stern*, 639 F.3d 449, 451 (8th Cir. 2011) (quotation omitted).[3]

The district court did not err in finding that O.N.C.'s habitual residence is the United States. From O.N.C.'s perspective, his move to the United States has resulted in "a sufficient degree of continuity to be properly described as settled." *Barzilay*, 600 F.3d at 918 (quotation omitted). The record supports that the alleged wrongful retention occurred either in July 2014, when Ocean filed for divorce, or in October 2014, when the six-month period under the travel agreement expired. At either of these junctures, O.N.C. had been living in the United States for almost two years—a significant portion of his young life. From his perspective, his family had moved to the United States indefinitely and established a home there, and he maintained considerable connections to his environment. O.N.C.'s mother obtained employment, purchased a vehicle, and rented an apartment for the family. O.N.C. attended school and speech-therapy classes, had a pediatrician, socialized with friends, and had extended family in the area. During the relevant time period, he primarily spoke English and participated in activities at his local Jewish Community Center. At the same time, little evidence establishes O.N.C.'s connection to Israel. In sum, O.N.C. experienced "a clear change in geography" and had acclimated to life in the United States. *See Sorenson v. Sorenson*, 559 F.3d 871, 873-74 (8th Cir. 2009) (finding

---

[3]Yaccov urges the court to adopt the standard applied in the Second Circuit, among others, which gives dispositive weight to parental intent. *See, e.g.*, *Gitter v. Gitter*, 396 F.3d 124, 134 (2d Cir. 2005) (concluding that the first step in determining a child's habitual residence is to "inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared"). However, this court, sitting *en banc*, declined to adopt this standard and decided that we determine habitual residence from "the child's perspective." *Silverman*, 338 F.3d at 898; *see also Stern*, 639 F.3d 452 (noting the circuit split).

habitual residence in Australia where the child moved to Australia with her family and their possessions, had spent most of her life in Australia, attended preschool and had friends in Australia, and spoke with an Australian accent).

Moreover, the parents' intent supports this conclusion. Both Yaccov and Ocean intended to move O.N.C. to the United States for at least three to five years, if not indefinitely. They applied together for O.N.C.'s U.S. citizenship and planned for Ocean and O.N.C. to settle in St. Louis and establish a home there until Yaccov could join them. In furtherance of this plan, Ocean established a life in St. Louis—all the while sending money to Yaccov in an effort to enable him to join his family. Both parties understood that O.N.C. would be without Yaccov for a significant period of time and that Ocean would establish a home in his absence.

Although Yaccov claims that the relocation was temporary and purely conditioned on his ability to join the family, this idea first appears in the travel agreement, which was drafted and signed well after the move and coincided with the deterioration of the marriage in April 2014. Moreover, even if we consider the agreement as conveying parental intent, the agreement itself contemplates an eventuality in which Ocean and O.N.C. would remain in the United States. That is, if Yaccov breached the condition that he "stay away from crime and not get into trouble," then he could not expect Ocean and O.N.C. to return to Israel. The record reflects that this is precisely what occurred, as Yaccov was arrested for driving without a valid license in August 2014. Given the lower weight afforded parental intent and that the record cuts against Yaccov's interpretation, we agree with the district court that Yaccov has not demonstrated by a preponderance of the evidence that O.N.C.'s habitual residence is Israel.

Accordingly, the district court did not err in finding that O.N.C.'s habitual residence is the United States and, thus, that the retention was not wrongful within the meaning of the Convention.

## III. Conclusion

For the foregoing reasons, we affirm.

_____